et al versus Hubble for the oh, by the way, it's case number 4110080 for the appellant William Hebron and for the appellant Anastasia Brooks. Please proceed. May it please the court. Opposing counsel. My name is Will Hebron. I represent Roman Hubble. He's the father of the children involved in this case. I had difficulty writing the memorandum. There's a lot to cover. I maybe didn't get it all covered. Maybe I didn't write as well as I should. Maybe I won't argue real well today. I don't get up here much. Nonetheless, I'm here today asking for a reversal of the lower court decision. First of all, I feel the lower court committed a reversible error when it terminated my client's parental rights, who is the father, after a fitness hearing and before a best interest hearing. The law is clear that in these kinds of situations, you cannot terminate rights until you've had a best interest hearing. After the court terminated the parental rights, I stated to the court, I think you have to terminate the rights. I said, I think before you can terminate the rights, you're supposed to have a best interest hearing. At this point, the rights haven't been terminated, have they? And he said the rights have been terminated. Well, I think that was just a misstatement by the court inasmuch as he subsequently did have a best interest hearing. There was a subsequent best interest hearing. As was to your credit that you corrected the court, by the way, counsel. I'm trying to educate him of the fact that I think he's wrong and he's ignoring me. And you were successful. I don't know if I was or not. But you had a hearing. I got a hearing, but I guess the question I've got is, it seems to me when somebody tells me that when I've talked to them, maybe they've already formed their opinion. That's at worst, that they've formed their opinion and now I've got a real problem. And by the way, you may say, well, why don't you just change judges who already did that? Judge Brunton heard this case concerning the fitness, went on administrative leave after hearing it, so she didn't make the decision. So it was assigned to Judge Diehl. I moved for a change as a matter of right, got it, and then I'm in front of Judge Lonergan and I can't move it again very easily. So I'm with him and I don't want to anger him. But he's told me kind of what his opinion is. That's at worst. At best, he's maybe changed the burden on me. Because, you know, that's not my burden of proof. At the best interest hearing, the burden of proof is on the state. It's not on me. And it appears to me when he says those kinds of things, I've got the burden of convincing him that it's in the best interest of my client. Was there anything that he said or did at the best interest hearing which led you to believe that he had switched the burden of proof over to you? Just the fact that it appears to me he already made a decision on a real important issue. It appeared to you at the time that he said parental rights were terminated, he had already made the decision, or when the best interest hearing began later on, several days later? It appeared to me that when he said the rights had been terminated, they'd been terminated. I'm telling him, no, I don't think you can do that. And he's saying they're done. Now, he conducts a hearing. He's got to do it. I've told him he's got to do it, and maybe somebody educated him to do it. But he's got to do it. But I think the burden's almost shifted. I think he's formed his opinion. If not, the burden's shifted on me. I don't think it's fair. So it's automatic reverse lawyer at this point? I feel like it is when a judge says that kind of thing to you. And by the way, when you try to correct him, and it's still the same thing, it's like, okay, okay. We'll see if at a best interest hearing I can convince you otherwise. And by the way, that's not my burden. So that's my feeling. That's my argument. So I'll leave that. I don't want to go any further with that. But why would it – given this record, why is it that he erred in the best interest hearing in deciding that termination was appropriate? Okay, first of all, at the conclusion of the best interest hearing, I asked him to take into consideration the fitness evidence as well. And he agreed to do that. That was taken. So I guess what I'm trying to say is it's all the evidence, rather than trying to limit myself. Well, at the best interest hearing, the court has now decided that your client does not fit under the statute and is in the best interest of the children, but his parole right should be terminated. Okay, and I'll give you an answer. Okay. These kids, at that time, DCFS had three of them more than half their life. They'd been with them more than half their life. Most of them had not lived together. They'd lived several places separate, four of them. They'd lived all over the place, been moved. All of them suffer from mental problems. All of them take psychotropic medication. All of them are getting mental health counseling. As I said, they've been moved all over the place. They've lived elsewhere, have not lived. One's lived somewhere since 2004. One was placed somewhere in 2006 and just recently moved before the fitness hearing again. So they've been moved all over the place. The testimony concerning best interest was really weak. They had a psychiatrist testify who interviewed him in 2005, said she talked to him for three hours, done an MMPS, a personality test, which involved 557 true-false questions, and that took up part of the three-hour test. And she said that she thought he would be poor at fathering, you know, being a parental figure. That's back in 2005. By the way, this decision is not made until 2010. The other person who talked about, who had really observed my client and talked about what's in the best interest had only observed my client and not all the time. Well, maybe I'm not being clear. Okay. Sum it up. Give me the one paragraph or less response of why is it not in the best interest to terminate your client's parental rights? Okay. First of all, two of them move frequently. One of them just recently again. One of them is in a behavioral home. When he was originally placed, he was able to go to a regular foster home. He now can't go to a regular foster home. DCF doesn't think they'll ever be able to put him up for adoption or replace him. They're going to have a real hard time with that. But he doesn't want a relationship with the father. Isn't that the child that does not want a relationship with the father? And I can talk to you about that, too. But at this point, the father may be a resource you need for him. And maybe the other was just moved again, who was moved just before the fitness hearing in, I think, 2010. What's going to happen to these kids at this point, at the conclusion of the fitness hearing, finding that your client's parental rights should be terminated? What was the state's plan? They want to put him up for adoption. And? Well, I'm telling you, there's one you're not going to adopt, and there's testimony about that because he's a problem. Is there testimony about any prospective adoptive parents? Yes, on two. On two? Yes. And possibly on the third one who just moved in. They were always living apart. How old are they? 1995, 1998, 2000, 2002. They're all, I'm not real, I guess like a dad in a divorce, how old are they? I'm not real good. They're kind of 15 to 8 or 9. And regarding the two for whom adoption is probable or likely or out there, and the third who might be, how is it in the best interest of those children for your client's parental rights not to be terminated? Well, first of all, that assumes that he's unfit, which I don't think is true. Well, you focused on the best interest hearing, and you're right. You've now found him to be unfit. I'm contesting that issue as well. Well, assume if the trial judge was correct in the unfitness finding, then the best, because you are appealing the best interest hearing, what is there to be said on why? Well, I guess what I'd say is, first of all, in order to support a termination, there has to be an unfitness finding. Right. And if there's not evidence, you know, if the evidence, if the manifest way of the evidence is against a finding of unfitness, you don't get termination. So the evidence in this case showed that in the near future, after, what, eight years of fooling around with parents, finally your client is ready to become a custodian. My client, as a matter of fact, let me just say this. If you look at the record, in 2006 they changed the permanency goal to termination of parental rights. It was changed. They didn't move forward on it. My client in 2007 really sort of straight, he was having an awful lot of economic difficulty. In 2007 he got a good job, got transportation, got housing, and started doing real well. In 2008, in April, April of 2008, I filed a motion for a change of custody and to change the permanency goal so we could get them back. They still hadn't done anything. Only then, only then did they file a petition to terminate rights. If they think it's so important to get these kids out of my client, away from my client, why do they wait until I come in and file? Well, there's no question, Counsel, that this is an embarrassment for the judicial system and we totally failed these children. And then I can't, they're not even serving, they're not even serving with papers until December. I can't get a hearing until almost 10 months later. This is really awful. It's like the state is appearing pro se and the trial court has abandoned its responsibilities with regard to its warrants. This isn't your client's fault or your fault, but it's the fault of the system and the judiciary primarily with regard to this terrible time that these children have bounced around in foster homes without the permanent, loving, stable homes that all children are entitled to. Yeah, but my client is essentially being punished for the delays, and the delays... No, his argument is, his parental rights should have been terminated six, seven years ago. You know, I would disagree with that, and I don't think that's... If the system worked properly, we would have had the first nine months after, has he shown reasonable progress so that he's now going to be taking care? No? That's it? Well, at the end of six months, at the end of the six months after the first nine-month period, there was a permanency order said that he'd substantially complied with what needed to be done. So six months into that nine-month period, he's done what needs to be done. So it's not like he's failed those first nine months. Counsel, doesn't the evidence show that from July 4, 05, through April 4, 06, that being the nine months, immediately find the initial nine-month period, respondent received an overall unsatisfactory rating on two separate client service plans? I think that overall he did poorly during there. I would say that's true. He was really having difficult financial circumstances, having a real hard time during that period of time. He was not getting any assistance concerning visits. He'd ask for visits in his hometown, and they wouldn't give him that. They always make him travel somewhere else to visit. They never would give him visits in hometown. He was having a whole lot of difficulty during that period of time. But I would say this. The reason why these kids are removed is because mom was not supervising them. The parents were split. They were living in separate communities. Mom had those kids. She was not supervising, and they took them. He didn't even know they took them. He found out later and wrote the judge a letter and said, I want my kids, and came into court, and he's been trying to get his kids from then to now. Now, there's been some difficulty there in the middle, but the whole idea here has been it's been inadequate supervision on the part of the mom. It's not the dad. And as a matter of fact, if you look at those reports, he's a good supervisor. And if you look at those visitations, and by the way, that's Addis workers talking about it. That's Addis workers talking about what happened at these visits. If you read those things, the visits were good, and he was good. He was good with supervising the kids. There were times he couldn't afford to buy meals. He's bringing meals to places from his home to feed his kids. He couldn't always afford to buy gifts, but when he could, he did. I mean, this guy for six years has visited with his kids. They've made it difficult for him to even visit with them. But he did miss several visits, didn't he? Absolutely. There were two periods where he was having a whole lot of trouble. He had to essentially go through an administrative process to get them to give him rides to visit. And once he got those rides, he went. And it's not like he's still at kind of, you know, he's still there. So the only time he missed visitation is when there was a lack of transportation? Yes. And he wrote them a letter and said, would you please let me visit in my hometown? Where was that? It's in the record. Where is his hometown? Girard. We visited in Litchfield. We visited in Decatur. We visited in Jerseyville. We visited in all kinds of places. We got one visit in his home in six years, and it went well. The rest of them were somewhere else. Never in his home. And he's having trouble visiting. He went to the library and tried to say, he said, could I have some visits here? Tried to arrange for places in town, which they ignored. It's like, you're going to visit where we want you to visit, and by the way, you're going to have to travel. And if you don't have any money, tough luck. If you want to do something about it, appeal the process. Which he did, and he finally got some visits. And when he got some transportation, he got a ride and got there. And he's been good. I mean, it would have been much easier for this guy to quit a long time ago. This guy didn't quit. It's easier to go home and say, forget it, I'll have some more babies. He didn't do that. For six years, he's been pursuing this. Come to court. Visited. Two-hour visit somewhere else in plant quarters. They didn't help him at all. Didn't help with housing. Did nothing for him. So the court had unfit dad. At the hearing, the court can conclude that in the near future, your client will be able to have the children returned to his custody. The court will be able to determine that in the near future because your client will fully comply with all the directives previously given to him. He has this trouble with this evaluation they want him to do. Oh, he's never been convicted of a violent crime. Is that what the record shows? Yes. He can live with that thing forever. He's never been convicted of a violent crime or domestic battery. I didn't mention anything about a crime. I know that. I'm saying that he will be now prepared to have addressed the concerns that resulted in these children being placed so that they, as you correctly pointed out, they've been bouncing around foster homes for what, eight years now? 2004 to now. It's outrageous. That's why there is this provision that termination of parental rights occurs when parents are given an opportunity of nine months or maybe 18, and if you haven't got it done, that's it. And, by the way, all the difficulty is having economic difficulties. It doesn't matter. The kids are either going to be capable of going to his home and he's going to be custodian or not. You know, children have to be someplace, so either they're going to be with the foster parents and bouncing around and lost their hearts, the foster parents are doing this and helping out, or they're going to be with him because he is now capable of taking their custody. He would tell you he's ready to do what he needs. He would need services because he's going to have to transition him back in. He would tell you he's ready to do that. And he's been working for three years at Study Employment. I would say this. I said a long time ago, why don't you just let him see how he does? Maybe he'll give them back to you. But we didn't get that either. You know, why don't you let us visit him at home? Why don't you give us a little bit of a chance to see what we can do? We never got that. No overnight visits, no weekend visits, nothing like that. Just come once a month. You'll see him for two hours and you can travel somewhere and see him. I mean, it's astonishing to me that a father could be treated this way. Just so little opportunity to try to – they could have assisted him and tried to transition those kids back into homes in 2005 and 2006 with some help, get him into a housing project home or something. They did nothing for this guy. They did nothing. If you told them, they probably would have done more. The mother was involved at that point? Here's the good part. They terminate my client's rights on Zach, the 15-year-old. Now, Mom is the one that was neglected. Mom, after she neglected him, left the state. Mom didn't visit with him for a couple of years. Then they say, by the way, with regard to Zach, we're not going to terminate her rights on Zach, but we're going to terminate Dad's, who's been visiting with him all along. I thought hers were terminated on all the kids. Yes. But he has animosity towards the father. Where does that come from? I'm not sure Zach is mentally ill. You want to know about the incident? I don't know about any incident. I'm just asking you, does he have a bond with the mother? I don't know the answer to that. The father did a lot of visiting with him until September of 2008. And what happened was he went over after a long, he worked all week, he went over to Decatur from here to visit with him in McDonald's with the other kids. And they said to him, you know, you don't ever share anything about yourself with your kids. Would you share something with your kids?  That would be a good way to bond with them. So he went over and he talked to each of them. And he talked to Zach and he said, Zach, what would you like to know about me? And don't be smart. And Zach says, why are you such a bad dad? And he said, well, you know, which really offended him because he was tired, he'd been visiting for a long, long time, just coming over, spending money to come see this child, and this is the response he gets from this kid. So he said, well, why are you such a bad son? And then Zach started throwing stuff all over the place and making a big mess. And what happened was, he said, take Zach out. They took Zach out. And my client got to stay there and clean up that mess. And rather than dealing with that issue, Zach just said, I don't want to see my dad anymore. And they said, fine, you don't have to see him, even though you were rude. I mean, if that's their idea of best interest, not acquainting Zach with his dad's version of this, I don't know how they can even determine what best interest is on children. When a parent says to a child who has mental health issues, why are you such a bad son? You don't find that problematic? I do find it problematic. And it hurt him. He would say it hurt him. It did hurt him. But let me just say this. Zach has been stealing. I mean, he knows about it. Zach's been doing all kinds of bad things. He's been stealing, hitting people, doing a lot of bad things. That's why he can't go to a foster home. Counsel, you'll have time in rebuttal, Ms. Brooks. Okay. Thank you. Thank you. May I please support and counsel? My name is Anastasia Brooks, and I represent the people in this case. First of all, with respect to the first issue, it was an unfortunate situation that developed with the sitting judge at the time, Judge Brunton, who had left the bench as a result of the courthouse incident. And then the replacement judge in this case, Judge Patrick Mondragon, apparently had not had experience hearing termination in criminal rights cases. And the record does not directly support the allegation that Judge Patrick Mondragon was biased or prejudged the outcome of the best interest hearing because all the respondent has to go on here is the remark by Judge Mondragon after making the unfitness finding that parental rights were being terminated, which was actually a mistake of law in the sense that termination order is a final severance of the parental rights. And what the judge apparently meant to do was simply make an effective finding of parental unfitness. So respondent's counsel aptly insists on the best interest hearing. Now, if his parental rights had, in fact, been terminated, he would be gone from the case. He would not be appearing or participating at the best interest hearing. But instead he was... Well, you understand counsel's argument, though. The trial court says, parental rights terminated. Counsel says, what? Don't we have to have a best interest hearing? As I said, parental rights terminated. And then, oh, yeah, we do have to have a best interest hearing. Counsel says it seems like it had already been decided for the best interest hearing ever started. You're saying no? Totally unjustified by counsel to feel that way? No, but the only thing he has to rely on is the fact that the judge was making this finding of termination prematurely, but there's no reference... That's a pretty big deal, though, isn't it? That's a huge step in the case, but there was no intent to actually end the case right there because they, in fact, did go on with respondent fully participating through counsel at the best interest hearing, and the judge also went ahead in chambers and talked to the three younger boys. And it was no indication that this was somehow just a simple pro forma exercise, that somehow, oh, okay, now respondent says I have to do a best interest hearing, so the judge just says, okay, here's your best interest hearing, and it's over in five minutes and the finding is entered. It's not anything like that. It was a full and fair hearing at which he was participating, which means that unless this court believes that Patrick Londrigan has to be removed for prejudice, which is a very severe finding to make, and then wants to send it back for a new best interest hearing before a different judge, the respondent has already received all the relief that he would be entitled to, which is being able to go to a best interest hearing and participate at it. He's already gotten that relief. That means that the error is moot as far as that issue is concerned because he's gotten all the relief he would be entitled to in the state's view. And the only thing he could be entitled to that he has not received, which we would object to, is a new hearing before a different judge. And then he'd have to make the showing that Judge Londrigan is so prejudiced on the issue of best interests. And there was no indication other than just the simple remark that the rights are terminated. He didn't actually make any best interest findings that would be necessary. Judge Londrigan didn't verbalize best interest findings before the best interest hearing. So essentially the termination order that he tried to enter would have lacked the necessary findings to enter it. So it's therefore, the state's position is that that order was misguided, that it should be essentially ignored because it was not intended to be an actual termination order after a best interest finding had been made. So for that reason, there is no per se reversible error on that issue. And the defendant would have to show prejudice by the judge and prejudice to his case on the issue of best interests in order to get a new hearing before a different judge. What's there evidence that the defendant refused to allow access to his home by the case workers? I'm not sure. I should have cited that in my brief. I don't remember exactly. Well, there was a Daniels, who was Torrey Daniels, apparently testified that the defendant during the period of March 2006 through August 2006 continued to refuse access to his home. Do you know why? Why was he refusing access to the workers? Okay. Well, another thing I cited in my brief on page 4 is when Spicer, the earlier case worker, had been required to meet monthly in the home, refused entry because of ongoing lack of water and gas utilities. I'm not sure exactly what homes he had moved to, because I think once he got the job with the landlord, he was able to get a good job and part of that was decent accommodations before perhaps because of financial issues. He didn't have working utilities is what the case worker had concluded as the reason for why there was no entry of access. It's like, it's a nice day outside, why can't we just meet here? But the case worker obviously went to see the inside of the home to see if it's suitable. Particularly when the respondent is now complaining that DCFS never actually gave him visits inside the home. Well, they have to be able to see if it's a suitable location before they can offer visits there. And I'm not sure if this is in my brief, but I thought the record showed that one of the reasons why visits were scheduled in places other than Girard was the fact that they were, their children were now living in many other locations. And bringing together four children for visits is a challenge logistically. And it's easier to get respondent to that one location rather than have to haul in four children to one location. So that's perhaps why that decision was made. And the fact that he claims that the DCFS never helped him with anything, well, they had offered him gas reimbursement for a long time. I'm not sure exactly when that ceased because there was a period of time in which there was the change in permanency order. Well, that's going to change the posture of the case. Now he's only getting visits monthly, and he's perhaps not going to get as many services because the case is moving towards termination at that point. But he was getting some assistance. And I'm not sure exactly what he asked for, but his level of cooperation was also not very good apart from the access to the home because there was also remarks he made about rather losing the kids rather than having DCFS make him do something he didn't want to do. And essentially that's what he got. He refused for a long time and claimed he did make one unsuccessful attempt at scheduling domestic violence assessment. Now he claims he's never been convicted. I don't know of any conviction for acts, but that's not necessary. Dr. Lanier made the recommendation. He had even admitted on cross-examination that he had incidents with Heather Hodges. Now I'm not saying he was a perpetrator in those incidents, but that is something that gives necessity to an assessment. And the caseworker, I think, clarified that all he's asking at that point was just do the assessment. You don't need to necessarily have services, although there was something for personality disorder-type groups as well. But he never even wanted to get that assessment. And if he did make that effort, which he claimed one time was unsuccessful, and in the several years, and now he's got a good job, now he's got financial resources, and now he's still refusing to get that domestic violence assessment. I believe the caseworker in his testimony was, well, did you appeal that? There's a service appeal process. If you disagree, the caseworker offered to put him back in touch with Dr. Lanier in order to have them hash out what's the basis for this recommendation. And so he was offered ways of challenging that recommendation. DCFS just wasn't going out there making him jump through extra hoops for no good reason. He had the domestic violence history, whether it's a victim or perpetrator, not saying it was any convictions or anything like that. But he was required to do that. And it was an important situation that was, according to the caseworkers, were informing him, this is preventing you from getting your children back. And because he refused to do that, he knew that. And that's why we proved, by clear and convincing evidence, that he failed to make a reasonable degree of responsibility. The statute is disjunctive. And his responsibility is failing, that's the MJ case, failing to substantially comply with the service plans. Even though he's visiting, even though the visits, when he does make them, are going well. It seems to think DCFS wasn't trying to help him get the kids back. They were trying to prevent it from happening. That's just totally in his head, as far as you're concerned. No evidence to support that whatsoever. Well, DCFS, they offer family preservation services. He was getting his services. I'm not sure exactly what he had asked for and was denied, other than, I'm not sure. They weren't trying to help, they were just an obstacle to me ever getting a chance to get the kids. I guess you're saying you totally disagree with that. I disagree because the court's orders and DCFS and their service plans and their requirements are obstacles to unfit parents regaining custody of their kids unless they can go through services and show that they are fit parents to have custody. And he did not do that. And that's why he sees domestic violence assessment as an obstacle. And it was an obstacle. And it wasn't just arbitrarily thrown up in his path. It was a necessary service for him to at least get the assessment. Was he asked about this at the hearing? I'm not sure if he was. Why did you fail to do this and what was the problem? I'm not sure exactly what his explanations were with respect to the assessment. I think he did claim that he made one attempt, which was unsuccessful, to schedule an appointment. But still he had years. He had resources eventually when he gets his good job at 07. So he really doesn't have an excuse at that point. In fact, his admission was that he didn't want to do what he didn't want to have to do. And he was just going to refuse to do that. If it meant losing his kids, unfortunately that's what it came to. And so to think somehow this is all DCFS's fault and he's blameless in this situation, it's totally untrue and the state does object to that characterization. So with respect to some of the other grounds for unfitness, the reasonable progress heavily relies on this six-month progress finding. But yet it's a nine-month period. He's got to keep up that progress. And just because it's progressing good enough for a satisfactory evaluation at six months doesn't mean that it's necessarily going to be satisfactory progress by nine months. So the nine-month period here didn't end until July 4 or 5. And in that time, there's still no obtaining of a psychological assessment from Dr. Lanier, which didn't happen, I believe, until November. So that's outside the first nine-month period. He had a chance to do that, but he didn't. Then the other thing is the evaluation, which was one month later, but still covers most of that nine-month period, the 05 evaluation by Wayne Spicer, found his progress to be unsatisfactory. Of course, new things are developing in that time. He's not able to get access to the home to realize that now he doesn't have working utilities. So that means adequate housing and working utilities becomes a new issue. And then there's also some information that domestic violence services also start getting added to his plan after Dr. Lanier's evaluation. So during the second nine-month period, new tasks are starting to mount on him. So what might have seemed to be somewhat reasonable progress after six months, at least definitely by the end of the second nine-month period, has shown that he's nowhere close to getting his kids returned to his care because of the problems with housing, because of lack of services, and the inconsistency of visitation, which had become an issue. And he claims transportation issues, but yet he can make it to some visits, but not all of them. It just didn't really seem to be an adequate explanation for his failure to visit consistently throughout the entire case. Although at times, of course, that might have been an adequate excuse for some failures to visit. So we're not conceding that lack of transportation is an adequate excuse for all of the failures to visit. And with respect to best interests, these findings, both on unfitness and best interests, should be reviewed deferentially. The standard reviews manifest weight. So therefore, the findings are supported like best interest finding was supported by recommendations from the caseworker as well as the guardian ad litem for recommending termination of respondent father's parental rights. And the refusal of contact, the termination of visits between respondent Zachary based on the recommendations of psychologists was what I believe was the reason why those visits were terminated. And the fact then that becomes that given his age, given that even though he's not going to be adopted according to the view of the caseworkers, he's old enough that his view, his permanency goal, could become independence rather than adoption. What's your response to the various references counsel made about the mental illness of some of these children? Well, I don't know if it's – I'm not sure exactly what the allegations were made in his brief. The claim is being that now somehow because they've been moved in subsequent substitute care, that there's been problems with that care that now they require psychotropic medication and counseling. Maybe those mental health issues were not apparent or recognized before they came into substitute care. So it's not fair to blame DCFS for the mental health issues of the children. What does the record show regarding the likelihood of these children getting adopted and finding stable homes, at least the younger three, if the best interest hearing is affirmed? Right. All I can work on is the scale of the record that exists, the testimony from the hearing. I'm not sure exactly at all. I have no information of what happened afterwards. Sure. From that point, we're reviewing the trial judge's determination based upon the evidence presented at that time. Right. And so at least as of that date of that hearing, one of the children was more recently moved into a home, which is considered a pre-adoptive placement where he could get permanency. So all three went in chambers at separate times and talked with the judge, and all three made remarks during those conversations approving of the current placements that they were in. So they were adoptive placements. They were satisfied and being well-adjusted. And the parents in those placements were going to seek to adopt them? I'm not sure exactly how explicit that evidence was, but I believe that the representation was made that those were, in fact, adoptive placements. That doesn't necessarily mean it will work out. And the oldest one is, what, 15? That was Zachary, the one who had more. He was being placed residentially rather than with an adoptive family. But essentially that these children are old enough to know exactly what they want, and they were able to express that with the judge, and the judge was able to make that finding based not only on the caseworker's recommendation, guarding the litem and all the other evidence, but also the views of the three younger children. So for those... Are they all together? I don't believe exactly. I think they might have been initially all separate, and one of them might have moved in as a sibling. So there might be two siblings that were together, but I'm not entirely sure. And then the third boy who was not institutionally placed was at a separate foster home. That's my understanding. So even though they're not entirely in the same home, that's only merely one factor that would be considered with respect to the best interests of the children. So for these reasons, State, thank you for your time, and request this court to defer the judgment. Thank you. Thank you. Rebuttal, please. With regard to the service plans that were proposed, your service plans are supposed to be designed with the objective of curing the problems that caused the removal to begin with. That's the whole concept. And the cause of the removal here was the mother's failure to properly supervise these children. So now we take that. It's not the dad. Well, the second incident involved that, but at the time of the first incident, weren't the parents living together in the same home when the child was found walking barefoot and unsupervised? And I'm not sure who was home. I'm not sure about that. I think that's correct. They were together. That's correct. They were together. But the second one, they were not together, and they'd been separated. And it was a matter of her not supervising the kids being on the tracks. And by the way, both times, it's that. It's lack of supervision. That's the problem. But if he, at that time, let's say she's got the children in her home. They're out there walking on the railroad tracks. DCFS comes in and takes them. If he's a suitable placement, that's their first angle is to place with the father. Well, he didn't even get notification of it. He didn't get notification of the hearing. Where was it? It was in Carlinville. Where was he? Girard. They didn't even look him up. They have to notify him within so many hours. They don't have to notify him for temporary. They did not. As a matter of fact, I think the first time contact is made with the court, it's by him with a letter to the judge, which you have a copy of. He wrote a letter and said, I understand my kids are in custody. I want them. I'm working. I'd like to have custody of my children. And then he came to the adjudicatory hearing in October. I mean, he became aware in September there was a problem there. We're taking it in August. But he's living in a different community. All I would say is, all right, so they're both not doing a good job of supervision. All right, let's put that in the service plan. But there's no evidence of any domestic violence, perpetrator of violence. Where is Heather Hodges? Heather is the mother. They're not married. I thought there was some incident not saying who was at fault. No, I think the evidence was that she was the perpetrator. That was the evidence. She's banging him around. So there's some evidence of domestic violence. They want him to get an assessment. And then they want him to go to perpetrator's classes. Well, how do you know? He didn't even have the assessment. Well, he went over to have an assessment. And they told him, we don't have classes like that for you. He went over to Hillsborough. There's evidence in the record. First of all, he was evaluated by the psychiatrist. And he went over to Hillsborough and tried to have it done. And then it's like, travel a long way, spend a lot of money. And it's like, I haven't ever been convicted of any violent crimes. I've never been convicted of domestic battery. I haven't done any of this. Why do you keep throwing this in my face? What about the investigation of his residence that came up? What's that all about? There's no question. He's been at odds with them. It's like, you want to come into my house. And essentially, you're not trying to help me. You're trying to discover evidence to prove that I'm not it, that I'm not a father. That's not the way it works. Because the state of Illinois does not want to have responsibility for these children. They want the parents. So why aren't they placing the kids with him right off? Is he admitting them into the home so that they can see what the home looks like? I'm just talking about that. Did he ever? I'm asking you. Did he ever? Yes, yes. Did he repeatedly refuse to allow them into the home? And a lot of times, he's let them in. Because there's been studies. If you look at the service plans, there's a lot of times they look at the home, and it's great. It's like, at the end of it, it's like, you're just coming in here. You're not trying to help me. All you're trying to do is uncover evidence about I'm not suitable. Because we're not getting any help. You can look at the record. I mean, they're giving us our visits, and that's it. Once a month, two hours. There's also evidence in the record that the client perceived himself to be a victim. The psychologist says some things about that. And as a result of the testing, he's defensive and everything else. That's a three- So as you're sitting here with a cold record, and the trial court judge saw the people testify is what I'm getting at. Well, one of them did, but that one, the one that heard a lot of the testimony is gone. That's true. But it was not on the termination part. He heard the termination evidence, didn't he? Yes, he did. He just didn't hear the initial adjudicatory. He didn't hear the fitness stuff. That's correct. All I would say, though, is he expressed an interest in having those kids in right after they were taken. What do you want relief for? What relief are you asking for? What I'm asking for- How do we get there? What I would be asking for is that you reverse the finding of unfitness, the finding of termination, that you directed a permanency order be entered by the lower court, talking about return to home within 12 months or whatever period you think is appropriate, and to provide services to the father, and for whatever relief you think appropriate. But essentially, what I'm saying is, you've never given us a chance- I don't think the evidence is there. I mean, to say this guy hasn't shown a reasonable degree of care and concern is, to my way of thinking, ridiculous. I'm just telling you. When you view what he's done, it's ridiculous. But that's me. You're trying to make a living. Well, it's hard for me to understand, because you basically are asserting that DCFS, in cahoots, I guess, with the state's attorney's office, just said, we're going to take these kids, and this dad's not going to get a chance to get them back. We're going to see to it that that is our objective and that we accomplish it. Well, let's put it this way. Since I got involved with the case in 2008- well, 2007, 2008, I mean, I'm trying to get a chance. That's what I ran into the whole time. We're done. We're done. Well, the case started in 2003. I understand that. But I don't get in. When I get in, I try to-I'm just telling you. When I get in, I'm trying to get the kids back. And I try to persuade them. And then if that doesn't work, I file for a change to get custody back. And that's the only time. Finally, they file termination proceedings. It's like, if you're sincere about that, where were you? The objective was changed in 2006. Why is it you don't do anything until I file in April of 2008? Then finally you do something. Then you don't even serve the dad. So I can't even get a hearing on my-I can't even get a hearing on my stuff because they want to put it all together. So I wait until February of the following year to even begin the hearing, and it takes almost a year to get the hearing done. And time's running on us. Okay. Thanks to both of you. The case is submitted. The court stands in recess until further call. Thank you for listening. Thank you.